774 A.2d 644 (2001)
340 N.J. Super. 414
KAM-TECH SYSTEMS LIMITED and Duration Systems Limited, Plaintiffs-Respondents,
v.
Rafael YARDENI, a/k/a Rafael Yardeny, a/k/a Rafi Yardeny, a/k/a Rafi Yardeni, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 8, 2001.
Decided May 24, 2001.
*646 Oury & Mizdol, Hackensack, for appellant, (Robert E. Laux, on the brief).
Sharkey & Campisi, Roseland, for respondents, (Jeffrey Campisi, on the brief).
Before Judges PRESSLER, KESTIN and ALLEY.
*645 The opinion of the court was delivered by ALLEY, J.A.D.
Defendant appeals from an order of the Law Division which enforced a civil money judgment rendered by an Israeli court by entering judgment in favor of plaintiffs for $218,039.73, plus interest, pursuant to N.J.S.A. 2A:49A-16 to -24, the Foreign Country Money-Judgments Recognition Act (Act), adopted in New Jersey in 1997. We affirm.
The underlying basis of the dispute involved sales by plaintiff to defendant of military and technical equipment, for which defendant allegedly did not pay. Plaintiff Kam-Tech Systems Limited is a company registered under the laws of Israel, and plaintiff Duration Systems Limited is a subsidiary of Kam-Tech. On July 10, 1995, the Magistrate's Court in Tel Aviv, Israel, by Judge David Geldstein, awarded plaintiffs a monetary judgment against defendant. On April 22, 1998, plaintiffs filed a complaint against defendant in the Superior Court of New Jersey seeking a judgment under the Act enforcing the Israeli court's money judgment. On plaintiffs' motion for summary judgment, defendant interposed several provisions of the Act in arguing against enforcement of the Israeli judgment.
Judge Joseph T. Ryan found as a matter of law that plaintiffs had established their right to prevail with the exception of two issues, namely, whether defendant had received sufficient notice of the Israeli judicial proceeding, and whether he had voluntarily submitted to the jurisdiction of the court in Israel. With respect to those issues the court decided that an evidentiary hearing should be held. Accordingly, the summary judgment motion was denied without prejudice and a plenary hearing was held on September 30, 1999, in which evidence was received on the specified issues. In a brief written opinion and an order entering a final judgment dated January 5, 2000, Judge Ryan rejected defendant's contentions and enforced the Israeli judgment in favor of plaintiffs by entering judgment pursuant to the Act for $218,039.73, plus interest from February 24, 1998.

I
The Act supplies a useful remedy for recognizing and enforcing foreign judgments. When New Jersey and the other twelve former British colonies originally subscribed to the United States Constitution, they did so as sovereign states accepting the unifying force of the Constitution's Full Faith and Credit clause.[1] The *647 Constitution, however, made no specific provision for recognizing or enforcing judgments entered by the courts of other nations. As a result, and in the absence of an implementing treaty or statute, the subject was deemed a matter of "comity," as explained in the leading case of Hilton v. Guyot, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1895). The Supreme Court in Hilton set forth principles governing the enforcement of foreign judgments in the United States:
The most certain guide, no doubt, for the decision of such questions is a treaty or a statute of this country. But when, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is, whenever it becomes necessary to do so, in order to determine the rights of parties to suits regularly brought before them....
No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call `the comity of nations.' Although the phrase has been often criticized, no satisfactory substitute has been suggested.
`Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.
[Hilton, supra, 159 U.S. at 163-64, 16 S.Ct. at 143, 40 L.Ed. at 108]
The Supreme Court concluded
[W]e are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.
[Id. at 202-03, 16 S.Ct. at 158, 40 L.Ed. at 112]
See also, Mercandino v. Devoe & Raynolds, Inc., 181 N.J.Super. 105, 107, 436 A.2d 942 (App.Div.1981).
The Act supplies a statutory basis for enforcing foreign judgments, a basis that was missing in Hilton, and represents an important progressive step in the recognition and enforcement in this country of money judgments of the courts of other *648 nations.[2] Its text, with minor variations, is that of the Uniform Foreign Money-Judgments Recognition Act approved by the National Conference of Commissioners on Uniform State Laws. See 13 U.L.A. 261 (1986). The original 1962 Prefatory Note to the uniform draft includes the following reasons for proposing this legislation:
In most states of the Union, the law on recognition of judgments from foreign countries is not codified. In a large number of civil law countries, grant of conclusive effect to money-judgments from foreign courts is made dependent upon reciprocity. Judgments rendered in the United States have in many instances been refused recognition abroad either because the foreign court was not satisfied that local judgments would be recognized in the American jurisdiction involved or because no certification of existence of reciprocity could be obtained from the foreign government in countries where existence of reciprocity must be certified to the courts by the government. Codification by a state of its rules on the recognition of money-judgments rendered in a foreign court will make it more likely that judgments rendered in the state will be recognized abroad.
The uniform act is now in effect, with local variations, in over thirty states, and thus is a fairly widespread mechanism for recognizing and enforcing money judgments awarded in the courts of foreign countries.[3]
*649 II
The Act expressly includes the Constitution's concept of full faith and credit, providing that a judgment enforceable under the Act will be "enforceable in the same manner as the judgment of a court of a sister state which is entitled to full faith and credit." N.J.S.A. 2A:49A-19. New Jersey's courts must recognize a final foreign country judgment for money damages as "conclusive between the parties," id., unless the judgment debtor establishes one of the specific grounds for non-recognition that are enumerated in the Act as follows:
2A:49A-20. Conclusiveness of Foreign Judgment
a. A foreign country money-judgment is not conclusive if:
(1) the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
(2) the foreign country court did not have personal jurisdiction over the judgment debtor; or
(3) the foreign country court did not have jurisdiction over the subject matter.
b. A foreign country money-judgment need not be recognized if:
(1) the judgment debtor in the proceedings in the foreign country court did not receive notice of the proceedings in sufficient time to enable the judgment debtor to defend;
(2) the judgment was obtained by fraud;
(3) the cause of action on which the foreign judgment is based is contrary to the public policy of this State;
(4) the judgment conflicts with a prior final and conclusive judgment;
(5) the proceedings in the foreign country court were contrary to an agreement between the parties under which the dispute in question was to be settled, other than by proceedings in that court; or
(6) in the case of jurisdiction based only on personal service, the foreign country court was a seriously inconvenient forum for the trial of the action.
Defendant challenges the Israeli judgment on four grounds: due process, personal jurisdiction, notice and fraud, which we now consider.

III
Defendant urges that the trial court should have deemed the Israeli judgment not conclusive because, he claims, it comes within a section of the Act that provides that New Jersey courts will not enforce a foreign country judgment "rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law...." N.J.S.A. 2A:49A-20a(1). At the original summary judgment hearing, Judge Ryan rejected this assertion as a matter of law.
As a threshold matter, with respect to the burden of proving a ground for a judgment's non-enforcement set forth in N.J.S.A. 2A:49A-20, we conclude that in order to foster the entirely sensible policies of the Act, it should be on the party asserting the ground, here defendant. This is consistent with Dart v. Balaam, 953 S.W.2d 478, 480 (Tex.App.1997), where, as here, one of the grounds raised in opposition to the foreign judgment *650 was that it was rendered "under a system [that did] not provide ... procedures compatible with the requirements of due process...." 953 S.W.2d at 479. See N.J.S.A. 2A:49A-20a(1). We see no reason on the present facts to depart from the Dart v. Balaam result, especially inasmuch as the Act provides, N.J.S.A. 2A:49A-24, that it "shall be so construed as to effect its general purpose to make uniform the law of those states which enact it." The approach we take also conforms with our State's general rule regarding the burden of proving affirmative defenses, Pagano v. United Jersey Bank, 276 N.J.Super. 489, 500, 648 A.2d 269 (App.Div.1994), aff'd 143 N.J. 220, 670 A.2d 509 (1996). See R. 4:5-4. It seems appropriate that the burden should rest on the party asserting such a ground, except when it might be shown that fundamental fairness would warrant shifting the burden, if, to give one hypothetical example, access to information about the foreign judicial proceedings is peculiarly within the knowledge or control of the party attempting to enforce a judgment or is inordinately burdensome for the opponent of the judgment to obtain.[4]
Our jurisprudence does not require that the procedures of a foreign court be identical to those used in the courts of the United States. Ingersoll Milling Machine Co. v. Granger, 833 F.2d 680, 687 (7th Cir.1987). What counts is not whether the procedures used are similar or dissimilar to ours, but "only the basic fairness of the foreign procedures." Id. at 688. The due process concept embodied in the Act requires a fair procedure "simple and basic enough to describe the judicial processes of civilized nations, our peers." Society of Lloyd's v. Ashenden, 233 F.3d 473, 477 (7th Cir.2000). The statute requires simply that the foreign *651 procedure be "compatible with the requirements of due process of law," namely, that "the foreign procedures are `fundamentally fair' and do not offend against `basic fairness.'" Id. The focus being the "basic fairness" of the foreign procedures, we find no basis for concluding that the procedures of the Israeli civil justice system fail to measure up to the Act's due process test.
A few words about the legal system of the State of Israel are in order. It formally came into being with the establishment of the Israeli State in 1948. Until near the end of World War I, the Turkish Ottoman Empire had for several centuries governed the geographical area in which the State of Israel is now located. In the period of the so-called British Mandate between the end of Ottoman control and the establishment of the Israeli government in 1948, aspects of English common law were made part of the legal system, and Magistrate's Courts, District Courts, and a Supreme Court were organized. Since 1948, substantive law has continued to evolve, but the court structure of the State of Israel has remained much the same. Courts must have personal jurisdiction over defendants; notice of proceedings must be given; there are rights to various pre-trial discovery; motions and hearings; and trials are conducted according to the adversarial system.[5]
In Society of Lloyd's v. Ashenden, supra, 233 F.3d at 476, the Seventh Circuit rejected as "risible" an objection to enforcing, under the Illinois version of the Uniform Foreign Money-Judgments Recognition Act, a judgment rendered by England's High Court, and affirmed by its Court of Appeal and then by the House of Lords' Appellate Committee, on the ground that the English legal system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law...." See also N.J.S.A. 2A:49A-20a(1). Defendant's assertions in this case about unfairness inherent in the Israeli civil court system, if not as extreme, nonetheless do not long detain us. He has provided us with no basis for concluding that the civil justice system of the State of Israel can in any way be considered lacking the attributes of due process. Although defendant relies on Bank Melli Iran v. Pahlavi, supra, 58 F.3d 1406, that case actually provides no support whatever for his position. Bank Melli involved an attempt to enforce a default judgment rendered by the Iranian courts against a sister of the deposed Shah of Iran, when, based on a showing of then-current political and social circumstances with respect to judicial proceedings in Iran, it would have been impossible for her to have received a fair hearing.
By contrast, defendant here is simply a judgment debtor in Israel, and we have no basis for questioning the adherence of the civil courts of the State of Israel to the rule of law or their commitment to the norms of due process. Defendant offers no specifics to support any of his allegations that attributes of due process were lacking. Moreover, not only has defendant failed to provide any authority to support his challenge to the Israeli civil judicial system, but in addition our own research has not uncovered a single case in which a civil judgment of one of those courts has *652 been found to have been rendered in violation of our due process standards.
We conclude that there is no merit to defendant's challenge to the judgment of the Israeli court, and in particular that defendant has furnished no basis for us to conclude that the judgment against him was rendered, in the language of the Act, "under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law...." N.J.S.A. 2A:49A-20a(1).

IV
Plaintiff also challenges the judgment of the Magistrate's Court of Tel Aviv by asserting that it is not conclusive under the Act because the Israeli Court "did not have personal jurisdiction over [him]...." N.J.S.A. 2A:49A-20a(2). This contention is also without merit. There is no doubt that defendant through his authorized counsel entered an appearance in the proceedings pending in Israel and consented to the relief contained in the judgment plaintiffs now seek to enforce. The proofs submitted show that defendant retained counsel in Israel and reached two compromise agreements with plaintiffs on the matters in dispute. At the parties' request and consent the Israeli courts gave both compromise agreements the validity of a court decision and effect of a judgment. Under the Act, the "judgment shall not be refused recognition for lack of personal jurisdiction if ... the judgment debtor voluntarily appeared in the proceedings...." N.J.S.A. 2A:49A-21a(2). After the plenary hearing, Judge Ryan found that defendant had voluntarily appeared in that proceeding. We do not disturb that finding because there was substantial evidence to support it. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974); Roberts v. Cowgill, 316 N.J.Super. 33, 37, 719 A.2d 668 (App. Div.1998).
In any event, beyond the proofs as to defendant's voluntary appearance, there was also persuasive evidence that there were significant general contacts between defendant and Israel, as well as specific contacts between defendant and the business transactions in Israel that are here in dispute. Defendant's attorney in Israel acknowledged that she represented him in his "businesses in Israel." Moreover, defendant admitted doing business in Israel at plaintiffs' facility, and he had inventory supplies and products to which he made claims in Israel and which served as a partial basis for the events in dispute.
Defendant certainly had the requisite minimum contacts with Israel upon which jurisdiction of the Israel court could be predicated. He cannot sustain his suggestion that he had such a de minimus nexus with Israel that maintenance of a suit against him in an Israeli court would be offensive to "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945).
Our conclusion in this respect is consistent with a line of cases beginning at least with International Shoe, supra.[6] We rely on these principles in the absence of any citation by defendant of any principle of Israeli law as to personal jurisdiction that was violated by the Tel Aviv Court's having *653 asserted jurisdiction against him, in which case it is reasonable to use our own concepts concerning personal jurisdiction as a point of reference.
A New Jersey court may exercise personal jurisdiction over a non-resident defendant to the "outermost limits permitted by the United States Constitution." Avdel Corp. v. Mecure, 58 N.J. 264, 268, 277 A.2d 207 (1971); R. 4:4-4(b)(1). In assessing the reasonableness of subjecting a non-resident defendant to personal jurisdiction, we look to whether there have been minimum contacts with the forum state that are consistent with due process. Matsumoto v. Matsumoto, 335 N.J.Super. 174, 182, 762 A.2d 224 (App.Div.2000); See also, International Shoe, supra, 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed at 102. The minimum contacts analysis consists of two parts. First, a court must determine whether minimum contacts exist at all. Waste Management, Inc. v. Admiral Ins. Co., 138 N.J. 106, 122, 649 A.2d 379 (1994). Second, a court must decide "whether those minimum contacts establish jurisdiction consistent with considerations of fair play and substantial justice." Id. at 121, 649 A.2d 379; International Shoe, supra, 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102. Essentially it must be determined whether the defendant has purposely availed himself of jurisdiction in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75, 105 S.Ct. 2174, 2183, 85 L.Ed 2d 528, 542 (1985); Severinsen v. Widener University, 338 N.J.Super. 42, 48, 768 A.2d 200 (App.Div.2001).
It is beyond legitimate dispute that a fair basis existed for the Israeli court to exercise specific jurisdiction over defendant.[7] As noted, the record shows there were general contacts between defendant and the State of Israel. It also shows specific contacts between defendant, plaintiffs, and the Israeli business transactions in dispute. See Severinsen, supra. These contacts include defendant's admitted transaction of business in Israel at plaintiffs' facility, and the inventory, supplies, and products to which he made claims in Israel and which served as a partial basis for the matters in dispute.
Thus, defendant certainly had the requisite "minimum contacts" with Israel, and the nexus between him and Israel is such that maintenance of the action in Israel did "not offend traditional notions of fair play and substantial justice." International Shoe, supra, 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed at 102. Even apart from his having voluntarily subjected himself to the jurisdiction of the court in Israel, and his agreement to the terms by which the issues in dispute would be resolved there, it is fully consistent with the norms of due process to conclude that defendant was personally subject to that court's jurisdiction.

V
Defendant argues that we should exercise our discretion and deny enforcement of the Israeli judgment because he did not receive notice in sufficient time to enable him to defend in the Israeli proceeding. *654 We reject this contention as well.[8]
Even accepting defendant's contention that he did not receive the summons, the evidence presented shows that defendant mounted a defense against the plaintiffs. Defendant appeared in the Israeli case by having his attorney appear for him, giving notice of his intention to defend the claim. In the course of the litigation there defendant agreed to two compromise agreements, the latter of which covered all claims between the parties in Israel. After the plenary hearing, Judge Ryan specifically determined that in the Israeli proceeding defendant "had a fair opportunity to contest the claims." We defer to this finding as grounded on substantial evidence. Rova Farms Resort, supra. Defendant has no basis for asserting that plaintiffs' Israeli judgment is unenforceable under N.J.S.A. 2A:49A-20(b)(1) because he did not receive notice of the disputes existing in Israel in sufficient time to defend. Indeed, he had adequate notice to be able to defend.

VI
Finally, defendant alleges that the issuance of "detention" orders against him by the Israeli courts was violative of public policy and resulted in a judgment against defendant being obtained by fraud.[9] A foreign country judgment is not conclusive if the judgment was obtained by fraud. N.J.S.A. 2A:49A-20b(2). The Supreme Court in Hilton v. Guyot, supra, stated that if the foreign forum provides a full and fair trial before a court of competent jurisdiction, "under a system of jurisprudence likely to secure an impartial administration of justice ... and there is nothing to show either prejudice ... or fraud in procuring the judgment," the judgment should be enforced and not "tried afresh." 159 U.S. at 202-03, 16 S.Ct. at 158, 40 L.Ed. at 112.
Although defendant asserts that the issuance of detention orders by the court in Israel was fraudulent, he provides no authorities and no facts that would support that proposition or justify the denial of the enforcement of the judgment. Irrespective of his contentions on such an ancillary issue, he does not even approach a showing that the judgment itself was obtained by fraud or by any impropriety in the Israeli courts. We thus reject his arguments that the judgment against him should not be recognized on those bases.

VII
In short, defendant's objections to the recognition and enforcement under the Act of the Israeli court's judgment are entirely without merit.
The order appealed from is affirmed.
NOTES
[1] U.S. Const., Art. IV, § 1, which provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."
[2] See generally, with respect to the enforcement of foreign judgments, Restatement (Third) of the Foreign Relations Law of the United States § 481, comments a and b (1987); Gary B. Born, International Civil Litigation in the United States Courts (3d ed.1996); Andreas F. Lowenfeld, International Litigation and Arbitration § 3 (1993); Linda J. Silberman, Enforcement and Recognition of Foreign Country Judgments in the United States, Practicing Law Institute: International Business Litigation and Arbitration (Course Handbook Series) at 257 (2001); David Epstein, Jeffrey L. Snyder & Charles Baldwin, International Litigation: A Guide to Jurisdiction, Practice and Strategy § 11.09 (3rd ed.1998).
[3] Despite the passage of more than one hundred years since Hilton, supra, which noted the absence of a treaty for the enforcement of foreign judgments, a multilateral treaty on the subject still does not exist. A possible treaty on the recognition and enforcement of foreign judgments is, however, in the process of current high-level discussions under the auspices of the Hague Conference on Private International Law. This draft is provisionally entitled Hague Convention on Jurisdiction and the Enforcement of Foreign Judgments, and its text is available at www.hcch.net/e/workprog/jdgm.html. See, for example, Arthur T. von Mehren, American Conflicts Law at the Dawn of the 21st Century, 37 Willamette L.Rev. 133, 142 (Winter 2001). Although the draft Convention is the subject of continuing negotiation and discussion, there is no assurance that it will be adopted. It is noteworthy, however, that other conventions sponsored by the Hague Conference with respect to private international laws matters have been adopted by the United States and numerous other nations. These include the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (23 U.S.T. 2555, T.I.A.S. No. 7444, 847 U.N.T.S. 231); Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. 163); Hague Convention on the Civil Aspects of International Child Abduction Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89, implemented in the United States by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 to 11610. The United States Department of State is participating in the negotiations and discussions on the draft Hague Convention on Jurisdiction and the Enforcement of Foreign Judgments. See Linda J. Silberman & Andreas F. Lowenfeld, A Different Challenge For The ALI: Herein of Foreign Country Judgments, an International Treaty, and an American Statute, 75 Ind.L.J. 635, 638 (2000). By contrast to the absence of a multilateral treaty with respect to the international enforcement of court judgments, the enforcement of international arbitral awards enjoys relatively widespread acceptance under the United Nations Convention on the Recognition and Enforcement of Arbitral Awards, 21 U.S.T. 2517; T.I.A.S. 6997; 330 U.N.T.S. 3 ("New York Convention"), as implemented in the United States by 9 U.S.C. §§ 201-208.
[4] The law on this issue with respect to the uniform act is somewhat sparse, but we note this discussion by the court in Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1409 (9th Cir.), cert. denied, 516 U.S. 989, 116 S.Ct., 519, 133 L.Ed.2d 427 (1995), which recognized that

[A] strong argument can be made that a claimed lack of due process should be treated as a defense. So doing would be consistent with the view of a leading commentary that "[t]here is much sense in making the party who claims the unusual occurrence plead it affirmatively so that the usual assumptions may be indulged in as a matter of course wherever there is no such claim." 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1271, at 445 (1990)....
A number of courts have so treated it. See Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1005 (5th Cir.1990) ("Section five of the Texas Recognition Act provides that a `foreign country judgment need not be recognized' if certain conditions exist. These conditions are phrased as affirmative defenses. Therefore, the burden of non-recognition rested with Khreich.") ...; McCord v. Jet Spray Int'l Corp., 874 F.Supp. 436, 440 (D.Mass.1994) (two exceptions to the inclusive nature of foreign judgments were raised, and the court determined that the "act specifically limits the defenses that may be raised in an action to enforce a foreign judgment."); Fiske, Emery & Assocs. v. Ajello, 577 A.2d 1139, 1141-43, 41 Conn.Supp. 376, 378-381 (1989) (the court noted that under the Foreign Money-Judgments Act, a foreign judgment will be recognized unless "one of the grounds for nonrecognition of the foreign judgment" is made out; the nonrecognition conditions were characterized as "defense[s]"). Contra, Ackermann v. Levine, 788 F.2d 830, 842 n. 12 (2d Cir.1986) (plaintiff sought enforcement of a foreign judgment under the Act and had to show prima facie that there was subject matter jurisdiction, personal jurisdiction, and that there were regular proceedings conducted by tribunals with procedures that are compatible with due process).
While the issue is extremely interesting, we need not resolve it at this time because..., whether ... [the deposed Shah's sister] had to put in sufficient evidence to sustain a defense or whether she had only to point to weaknesses in the Banks' case, she carried her burden.
[5] See 3 Thomas H. Reynolds & Arturo A. Flores, Foreign Law, III Israel 1-9 (1998); Yuval Levy, Pre-Trial and Pre-Hearing Procedures Worldwide 167-179 (Charles Platto ed., 1990); Israel Law Digest, in Martindale-Hubbell International Law Digest at ISR-4-5 (2001). See also, (1) a U.S. Department of State 1999 Country Commercial Guide for Israel, (2) a U.S. Library of Congress Country Study of Israel, and (3) an article by the Israeli Judiciary.
[6] See also, Burnham v. Superior Court of California, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); Shaffer v. Heitner, 433 U.S. 186, 97, S.Ct. 2569, 53 L. Ed.2d 683 (1977); Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), reh'g denied, 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92; McGee v. Int'l Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).
[7] If a cause of action arises directly out of a defendant's contacts with the forum state, the court's jurisdiction is "specific." Waste Management, Inc. v. Admiral Ins. Co., supra, 138 N.J. at 119, 649 A.2d 379 (citing Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322, 558 A.2d 1252 (1989)). If, however, the suit is not related directly to the defendant's contacts with the forum state, but is predicated instead on the defendant's continuous and systematic activities in the forum state, the state's exercise of jurisdiction is "general." Ibid.; see also Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 9, 104 S.Ct. 1868, 1872 n. 9, 80 L.Ed.2d 404, 411 n. 9 (1984).
[8] Under N.J.S.A. 2A:49A-20b, "A foreign country judgment need not be recognized if: (1) the defendant in the proceedings in the foreign country court did not receive notice of the proceedings in sufficient time to defend."
[9] Plaintiffs represented that Israel's judicial procedure allows for a "detention" order mechanism that prevents a defendant from leaving Israel until a bond has been posted or the order is vacated.